# GREATER NEW ORLEANS BROADCASTING ASSOCIATION, INC., ET AL. *v.* UNITED STATES ET AL.

No. 98–387.   Argued April 27, 1999—Decided June 14, 1999

174

STEVENS, J., delivered the opinion of the Court, in which REHN-QUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a concurring opinion, *post*, p. 196. THOMAS, J., filed an opinion concurring in the judgment, *post*, p. 197.

*Bruce J. Ennis, Jr.,* argued the cause for petitioners. With him on the briefs were *Ashton R. Hardy, Nory Miller,* and *Donald B. Verrilli, Jr.*

*Deputy Solicitor General Underwood* argued the cause for respondents. With her on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Deputy Solicitor General Wallace, Matthew D. Roberts, Anthony J. Steinmeyer,* and *Christopher J. Wright.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Advertising Federation by *Richard E. Wiley* and *Daniel E. Troy;* for the American Gaming Association by *John G. Roberts, Jr., David G. Leitch,* and *Frank J. Fahrenkopf, Jr.;* for the Association of National Advertisers, Inc., by *John J. Walsh, Steven G. Brody,* and *Gilbert H. Weil;* for the Institute for Justice by *William H. Mellor, Clint Bolick,* and *Scott G. Bullock;* for the National Association of Broadcasters et al. by *P. Cameron DeVore, Gregory J. Kopta,* and *Jack N. Goodman;* and for the Washington Legal Foundation by *David H. Remes, Patricia A. Barald, Daniel J. Popeo,* and *Richard A. Samp.*

*Gerald S. Rourke* filed a brief for Valley Broadcasting Co. et al. as *amici curiae.*

JUSTICE STEVENS delivered the opinion of the Court.

Federal law prohibits some, but by no means all, broadcast advertising of lotteries and casino gambling. In *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418 (1993), we upheld the constitutionality of 18 U. S. C. § 1304 as applied to broadcast advertising of Virginia's lottery by a radio station located in North Carolina, where no such lottery was authorized. Today we hold that § 1304 may not be applied to advertisements of private casino gambling that are broadcast by radio or television stations located in Louisiana, where such gambling is legal.

## I

Through most of the 19th and the first half of the 20th centuries, Congress adhered to a policy that not only discouraged the operation of lotteries and similar schemes, but forbade the dissemination of information concerning such enterprises by use of the mails, even when the lottery in question was chartered by a state legislature.[1] Consistent with this Court's earlier view that commercial advertising was unprotected by the First Amendment, see *Valentine* v. *Chrestensen*, 316 U. S. 52, 54 (1942), we found that the notion that "lotteries . . . are supposed to have a demoralizing influence upon the people" provided sufficient justification for excluding circulars concerning such enterprises from the federal postal system, *Ex parte Jackson*, 96 U. S.

---

[1] See, *e. g.*, Act of Mar. 2, 1895, 28 Stat. 963 (prohibiting the transportation in interstate or foreign commerce, and the mailing of, tickets and advertisements for lotteries and similar enterprises); Act of Mar. 2, 1827, § 6, 4 Stat. 238 (restricting the participation of postmasters and assistant postmasters in the lottery business); Act of July 27, 1868, § 13, 15 Stat. 196 (prohibiting the mailing of any letters or circulars concerning lotteries or similar enterprises); Act of July 12, 1876, § 2, 19 Stat. 90 (repealing an 1872 limitation of the mails prohibition to letters and circulars concerning "illegal" lotteries); Anti-Lottery Act of 1890, § 1, 26 Stat. 465 (extending the mails prohibition to newspapers containing advertisements or prize lists for lotteries or gift enterprises).

727, 736–737 (1878). We likewise deferred to congressional judgment in upholding the similar exclusion for newspapers that contained either lottery advertisements or prize lists. *In re Rapier,* 143 U. S. 110, 134–135 (1892); see generally *Edge,* 509 U. S., at 421–422; *Lottery Case,* 188 U. S. 321 (1903). The current versions of these early antilottery statutes are now codified at 18 U. S. C. §§ 1301–1303.

Congress extended its restrictions on lottery-related information to broadcasting as communications technology made that practice both possible and profitable. It enacted the statute at issue in this case as § 316 of the Communications Act of 1934, 48 Stat. 1088. Now codified at 18 U. S. C. § 1304 ("Broadcasting lottery information"), the statute prohibits radio and television broadcasting, by any station for which a license is required, of

> "any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes."

The statute provides that each day's prohibited broadcasting constitutes a separate offense punishable by a fine, imprisonment for not more than one year, or both. *Ibid.* Although § 1304 is a criminal statute, the Solicitor General informs us that, in practice, the provision traditionally has been enforced by the Federal Communications Commission (FCC), which imposes administrative sanctions on radio and television licensees for violations of the agency's implementing regulation. See 47 CFR § 73.1211 (1998); Brief for Respondents 3. Petitioners now concede that the broadcast ban in § 1304 and the FCC's regulation encompasses advertising for privately owned casinos—a concession supported by the broad language of the statute, our precedent, and the

FCC's sound interpretation. See *FCC* v. *American Broadcasting Co.*, 347 U. S. 284, 290–291, and n. 8 (1954).

During the second half of this century, Congress dramatically narrowed the scope of the broadcast prohibition in § 1304. The first inroad was minor: In 1950, certain not-for-profit fishing contests were exempted as "innocent pastimes . . . far removed from the reprehensible type of gambling activity which it was paramount in the congressional mind to forbid." S. Rep. No. 2243, 81st Cong., 2d Sess., 2 (1950); see Act of Aug. 16, 1950, ch. 722, 64 Stat. 451, 18 U. S. C. § 1305.

Subsequent exemptions were more substantial. Responding to the growing popularity of state-run lotteries, in 1975 Congress enacted the provision that gave rise to our decision in *Edge*. 509 U. S., at 422–423; Act of Jan. 2, 1975, 88 Stat. 1916, 18 U. S. C. § 1307; see also § 1953(b)(4). With subsequent modifications, that amendment now exempts advertisements of state-conducted lotteries from the nationwide postal restrictions in §§ 1301 and 1302, and from the broadcast restriction in § 1304, when "broadcast by a radio or television station licensed to a location in . . . a State which conducts such a lottery." § 1307(a)(1)(B); see also §§ 1307(a)(1)(A), (b)(1). The § 1304 broadcast restriction remained in place, however, for stations licensed in States that do not conduct lotteries. In *Edge*, we held that this remaining restriction on broadcasts from nonlottery States, such as North Carolina, supported the "laws against gambling" in those jurisdictions and properly advanced the "congressional policy of balancing the interests of lottery and nonlottery States." 509 U. S., at 428.

In 1988, Congress enacted two additional statutes that significantly curtailed the coverage of § 1304. First, the Indian Gaming Regulatory Act (IGRA), 102 Stat. 2467, 25 U. S. C. § 2701 *et seq.*, authorized Native American tribes to conduct various forms of gambling—including casino gambling—pursuant to tribal-state compacts if the State permits

such gambling "for any purpose by any person, organization, or entity." §2710(d)(1)(B). The IGRA also exempted "any gaming conducted by an Indian tribe pursuant to" the Act from both the postal and transportation restrictions in 18 U. S. C. §§1301–1302, and the broadcast restriction in §1304. 25 U. S. C. §2720. Second, the Charity Games Advertising Clarification Act of 1988, 18 U. S. C. §1307(a)(2), extended the exemption from §§1301–1304 for state-run lotteries to include any other lottery, gift enterprise, or similar scheme—not prohibited by the law of the State in which it operates—when conducted by: (i) any governmental organization; (ii) any not-for-profit organization; or (iii) a commercial organization as a promotional activity "clearly occasional and ancillary to the primary business of that organization." There is no dispute that the exemption in §1307(a)(2) applies to casinos conducted by state and local governments. And, unlike the 1975 broadcast exemption for advertisements of and information concerning state-conducted lotteries, the exemptions in both of these 1988 statutes are not geographically limited; they shield messages from §1304's reach in States that do not authorize such gambling as well as those that do.

A separate statute, the 1992 Professional and Amateur Sports Protection Act, 28 U. S. C. §3701 *et seq.*, proscribes most sports betting and advertising thereof. Section 3702 makes it unlawful for a State or tribe "to sponsor, operate, advertise, promote, license, or authorize by law or compact"—or for a person "to sponsor, operate, advertise, or promote, pursuant to the law or compact" of a State or tribe—any lottery or gambling scheme based directly or indirectly on competitive games in which amateur or professional athletes participate. However, the Act also includes a variety of exemptions, some with obscured congressional purposes: (i) gambling schemes conducted by States or other governmental entities at any time between January 1, 1976, and August 31, 1990; (ii) gambling schemes authorized by

statutes in effect on October 2, 1991; (iii) gambling "conducted exclusively in casinos" located in certain municipalities if the schemes were authorized within 1 year of the effective date of the Act and, for "commercial casino gaming scheme[s]," that had been in operation for the preceding 10 years pursuant to a state constitutional provision and comprehensive state regulation applicable to that municipality; and (iv) gambling on parimutuel animal racing or jai-alai games. § 3704(a); see also 18 U. S. C. §§ 1953(b)(1)–(3) (regarding interstate transportation of wagering paraphernalia). These exemptions make the scope of § 3702's advertising prohibition somewhat unclear, but the prohibition is not limited to broadcast media and does not depend on the location of a broadcast station or other disseminator of promotional materials.

Thus, unlike the uniform federal antigambling policy that prevailed in 1934 when 18 U. S. C. § 1304 was enacted, federal statutes now accommodate both progambling and antigambling segments of the national polity.

## II

Petitioners are an association of Louisiana broadcasters and its members who operate FCC-licensed radio and television stations in the New Orleans metropolitan area. But for the threat of sanctions pursuant to § 1304 and the FCC's companion regulation, petitioners would broadcast promotional advertisements for gaming available at private, for-profit casinos that are lawful and regulated in both Louisiana and neighboring Mississippi.[2] According to an FCC official, however, "[u]nder appropriate conditions, some broadcast signals from Louisiana broadcasting stations may be heard

---

[2] See, e. g., La. Rev. Stat. Ann. §§ 27:2, 27:15B(1), 27:42–27:43, 27:44(4), 27:44(10)–27:44(12) (West 1999); Miss. Code Ann. §§ 75–76–3, 97–33–25 (1972); see also La. Rev. Stat. Ann. §§ 27:202B–27:202D, 27:205(4), 27:205(12)–27:205(14), 27:210B (West 1999).

in neighboring states including Texas and Arkansas," 3 Record 628, where private casino gambling is unlawful.

Petitioners brought this action against the United States and the FCC in the District Court for the Eastern District of Louisiana, praying for a declaration that § 1304 and the FCC's regulation violate the First Amendment as applied to them, and for an injunction preventing enforcement of the statute and the rule against them. After noting that all parties agreed that the case should be decided on their cross-motions for summary judgment, the District Court ruled in favor of the Government. 866 F. Supp. 975, 976 (1994). The court applied the standard for assessing commercial speech restrictions set out in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 566 (1980), and concluded that the restrictions at issue adequately advanced the Government's "substantial interest (1) in protecting the interest of nonlottery states and (2) in reducing participation in gambling and thereby minimizing the social costs associated therewith." 866 F. Supp., at 979. The court pointed out that federal law does not prohibit the broadcast of all information about casinos, such as advertising that promotes a casino's amenities rather than its "gaming aspects," and observed that advertising for state-authorized casinos in Louisiana and Mississippi was actually "abundant." *Id.*, at 980.

A divided panel of the Court of Appeals for the Fifth Circuit agreed with the District Court's application of *Central Hudson*, and affirmed the grant of summary judgment to the Government. 69 F. 3d 1296, 1298 (1995). The panel majority's description of the asserted governmental interests, although more specific, was essentially the same as the District Court's:

"First, section 1304 serves the interest of assisting states that restrict gambling by regulating interstate activities such as broadcasting that are beyond the powers of the individual states to regulate. The sec-

ond asserted governmental interest lies in discouraging public participation in commercial gambling, thereby minimizing the wide variety of social ills that have historically been associated with such activities." *Id.*, at 1299.

The majority relied heavily on our decision in *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328 (1986), see 69 F. 3d, at 1300–1302, and endorsed the theory that, because gambling is in a category of "vice activity" that can be banned altogether, "advertising of gambling can lay no greater claim on constitutional protection than the underlying activity," *id.*, at 1302. In dissent, Chief Judge Politz contended that the many exceptions to the original prohibition in § 1304—and that section's conflict with the policies of States that had legalized gambling—precluded justification of the restriction by either an interest in supporting anticasino state policies or "an independent federal interest in discouraging public participation in commercial gambling." *Id.*, at 1303–1304.

While the broadcasters' petition for certiorari was pending in this Court, we decided *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484 (1996). Because the opinions in that case concluded that our precedent both preceding and following *Posadas* had applied the *Central Hudson* test more strictly, 517 U. S., at 509–510 (opinion of STEVENS, J.); *id.*, at 531–532 (O'CONNOR, J., concurring in judgment)—and because we had rejected the argument that the power to restrict speech about certain socially harmful activities was as broad as the power to prohibit such conduct, see *id.*, at 513–514 (opinion of STEVENS, J.); see also *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476, 482–483, n. 2 (1995)—we granted the broadcasters' petition, vacated the judgment of the Court of Appeals, and remanded the case for further consideration. 519 U. S. 801 (1996).

On remand, the Fifth Circuit majority adhered to its prior conclusion. 149 F. 3d 334 (1998). The majority recognized

that at least part of the *Central Hudson* inquiry had "become a tougher standard for the state to satisfy," 149 F. 3d, at 338, but held that § 1304's restriction on speech sufficiently advanced the asserted governmental interests and was not "broader than necessary to control participation in casino gambling," *id.*, at 340. Because the Court of Appeals for the Ninth Circuit reached a contrary conclusion in *Valley Broadcasting Co.* v. *United States*, 107 F. 3d 1328, cert. denied, 522 U. S. 1115 (1998), as did a Federal District Court in *Players Int'l, Inc.* v. *United States*, 988 F. Supp. 497 (NJ 1997), we again granted the broadcasters' petition for certiorari. 525 U. S. 1097 (1999). We now reverse.

## III

In a number of cases involving restrictions on speech that is "commercial" in nature, we have employed *Central Hudson*'s four-part test to resolve First Amendment challenges:

> "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." 447 U. S., at 566.

In this analysis, the Government bears the burden of identifying a substantial interest and justifying the challenged restriction. *Edenfield* v. *Fane*, 507 U. S. 761, 770 (1993); *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480 (1989); *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 71, and n. 20 (1983).

The four parts of the *Central Hudson* test are not entirely discrete. All are important and, to a certain extent, inter-

related: Each raises a relevant question that may not be dispositive to the First Amendment inquiry, but the answer to which may inform a judgment concerning the other three. Partly because of these intricacies, petitioners as well as certain judges, scholars, and *amici curiae* have advocated repudiation of the *Central Hudson* standard and implementation of a more straightforward and stringent test for assessing the validity of governmental restrictions on commercial speech.[3]  As the opinions in *44 Liquormart* demonstrate, reasonable judges may disagree about the merits of such proposals.  It is, however, an established part of our constitutional jurisprudence that we do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground.  See *United States* v. *Raines,* 362 U. S. 17, 21 (1960).  In this case, there is no need to break new ground.  *Central Hudson,* as applied in our more recent commercial speech cases, provides an adequate basis for decision.

### IV

All parties to this case agree that the messages petitioners wish to broadcast constitute commercial speech, and that these broadcasts would satisfy the first part of the *Central Hudson* test: Their content is not misleading and concerns lawful activities, *i. e.,* private casino gambling in Louisiana and Mississippi.  As well, the proposed commercial messages would convey information—whether taken favorably or unfavorably by the audience—about an activity that is the subject of intense public debate in many communities.  In addition, petitioners' broadcasts presumably would dissemi-

---

[3] See, *e. g.,* Pet. for Cert. 23; Brief for Petitioners 10; Reply Brief for Petitioners 18–20; *44 Liquormart, Inc.* v. *Rhode Island,* 517 U. S. 484, 526–528 (1996) (THOMAS, J., concurring); Kozinski & Banner, Who's Afraid of Commercial Speech?, 76 Va. L. Rev. 627 (1990); Brief for Association of National Advertisers, Inc., as *Amicus Curiae* 3–4; Brief for American Advertising Federation as *Amicus Curiae* 2.

nate accurate information as to the operation of market competitors, such as pay-out ratios, which can benefit listeners by informing their consumption choices and fostering price competition. Thus, even if the broadcasters' interest in conveying these messages is entirely pecuniary, the interests of, and benefit to, the audience may be broader. See *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 764–765 (1976); *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 96–97 (1977); *Bigelow* v. *Virginia*, 421 U. S. 809, 822 (1975).

The second part of the *Central Hudson* test asks whether the asserted governmental interest served by the speech restriction is substantial. The Solicitor General identifies two such interests: (1) reducing the social costs associated with "gambling" or "casino gambling," and (2) assisting States that "restrict gambling" or "prohibit casino gambling" within their own borders.[4] Underlying Congress' statutory scheme, the Solicitor General contends, is the judgment that gambling contributes to corruption and organized crime; underwrites bribery, narcotics trafficking, and other illegal conduct; imposes a regressive tax on the poor; and "offers a false but sometimes irresistible hope of financial advancement." Brief for Respondents 15–16. With respect to casino gambling, the Solicitor General states that many of the associated social costs stem from "pathological" or "compulsive" gambling by approximately 3 million Americans, whose behavior is primarily associated with "continuous play" games, such as slot machines. He also observes that compulsive gambling has grown along with the expansion of legalized gambling nationwide, leading to billions of dollars in economic costs; injury and loss to these

---

[4] Brief for Respondents 12, 15, 28. We will concentrate on the Government's contentions as to "casino gambling": They are the focus of the Government's argument and are more closely linked to the speech regulation at issue, thereby providing a more likely basis for upholding § 1304 as applied to these broadcasters and their proposed messages.

gamblers as well as their families, communities, and government; and street, white-collar, and organized crime. *Id.*, at 16–20.

We can accept the characterization of these two interests as "substantial," but that conclusion is by no means self-evident. No one seriously doubts that the Federal Government may assert a legitimate and substantial interest in alleviating the societal ills recited above, or in assisting like-minded States to do the same. Cf. *Edge*, 509 U. S., at 428. But in the judgment of both the Congress and many state legislatures, the social costs that support the suppression of gambling are offset, and sometimes outweighed, by countervailing policy considerations, primarily in the form of economic benefits.[5] Despite its awareness of the potential

---

[5] Some form of gambling is legal in nearly every State. Government Lodging 192. Thirty-seven States and the District of Columbia operate lotteries. *Ibid.;* National Gambling Impact Study Commission, Staff Report: Lotteries 1 (1999). As of 1997, commercial casino gambling existed in 11 States, see North American Gaming Report 1997, Int'l Gaming & Wagering Bus., July 1997, pp. S4–S31, and at least 5 authorize state-sponsored video gambling, see Del. Code Ann., Tit. 29, §§ 4801, 4803(f)–(g), 4820 (1974 and Supp. 1997); Ore. Rev. Stat. § 461.215 (1998); R. I. Gen. Laws § 42–61.2–2(a) (1998); S. D. Const., Art. III, § 25 (1999); S. D. Comp. Laws Ann. §§ 42–7A–4(4), (11A) (1991); W. Va. Code § 29–22A–4 (1999). Also as of 1997, about half the States in the Union hosted Class III Indian gaming (which may encompass casino gambling), including Louisiana, Mississippi, and four other States that had private casinos. United States General Accounting Office, Casino Gaming Regulation: Roles of Five States and the National Indian Gaming Commission 4–6 (May 1998) (including Indian casino gaming in five States without approved compacts); cf. National Gambling Impact Study Commission, Staff Report: Native American Gaming 2 (1999) (hereinafter Native American Gaming) (noting that 14 States have on-reservation Indian casinos, and that those casinos are the only casinos in 8 States). One count by the Bureau of Indian Affairs tallied 60 tribes that advertise their casinos on television and radio. Government Lodging 408, 435–437 (3 App. in *Player's Int'l, Inc.* v. *United States,* No. 98–5127 (CA3)). By the mid-1990's, tribal casino-style gambling generated over $3 billion in gaming revenue—increasing its share to 18%

social costs, Congress has not only sanctioned casino gambling for Indian tribes through tribal-state compacts, but has enacted other statutes that reflect approval of state legislation that authorizes a host of public and private gambling activities. See, *e. g.*, 18 U. S. C. §§ 1307, 1953(b); 25 U. S. C. §§ 2701–2702, 2710(d); 28 U. S. C. § 3704(a). That Congress has generally exempted state-run lotteries and casinos from federal gambling legislation reflects a decision to defer to, and even promote, differing gambling policies in different States. Indeed, in *Edge* we identified the federal interest furthered by § 1304's partial broadcast ban as the "congressional policy of balancing the interests of lottery and non-lottery States." 509 U. S., at 428. Whatever its character in 1934 when § 1304 was adopted, the federal policy of discouraging gambling in general, and casino gambling in particular, is now decidedly equivocal.

Of course, it is not our function to weigh the policy arguments on either side of the nationwide debate over whether and to what extent casino and other forms of gambling should be legalized. Moreover, enacted congressional policy and "governmental interests" are not necessarily equivalents for purposes of commercial speech analysis. See *Bolger*, 463 U. S., at 70–71. But we cannot ignore Congress' unwillingness to adopt a single national policy that consistently endorses either interest asserted by the Solicitor General. See *Edenfield*, 507 U. S., at 768; *44 Liquormart*, 517 U. S., at 531 (O'CONNOR, J., concurring in judgment). Even though the Government has identified substantial interests, when we consider both their quality and the information sought to be suppressed, the crosscurrents in the scope and application of § 1304 become more difficult for the Government to defend.

---

of all casino gaming revenue, matching the total for the casinos in Atlantic City, New Jersey, and reaching about half the figure for Nevada's casinos. See Native American Gaming 2; Government Lodging 407, 423–429.

## V

The third part of the *Central Hudson* test asks whether the speech restriction directly and materially advances the asserted governmental interest. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U. S., at 770–771. Consequently, "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson*, 447 U. S., at 564. We have observed that "this requirement is critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Rubin*, 514 U. S., at 487, quoting *Edenfield*, 507 U. S., at 771.

The fourth part of the test complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it. The Government is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest—"a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Fox*, 492 U. S., at 480 (internal quotation marks omitted); see *44 Liquormart*, 517 U. S., at 529, 531 (O'CONNOR, J., concurring in judgment). On the whole, then, the challenged regulation should indicate that its proponent "'carefully calculated' the costs and benefits associated with the burden on speech imposed by its prohibition." *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 417 (1993), quoting *Fox*, 492 U. S., at 480.

As applied to petitioners' case, § 1304 cannot satisfy these standards. With regard to the first asserted interest—

alleviating the social costs of casino gambling by limiting demand—the Government contends that its broadcasting restrictions directly advance that interest because "promotional" broadcast advertising concerning casino gambling increases demand for such gambling, which in turn increases the amount of casino gambling that produces those social costs. Additionally, the Government believes that compulsive gamblers are especially susceptible to the pervasiveness and potency of broadcast advertising. Brief for Respondents 33–36. Assuming the accuracy of this causal chain, it does not necessarily follow that the Government's speech ban has directly and materially furthered the asserted interest. While it is no doubt fair to assume that more advertising would have some impact on overall demand for gambling, it is also reasonable to assume that much of that advertising would merely channel gamblers to one casino rather than another. More important, any measure of the effectiveness of the Government's attempt to minimize the social costs of gambling cannot ignore Congress' simultaneous encouragement of tribal casino gambling, which may well be growing at a rate exceeding any increase in gambling or compulsive gambling that private casino advertising could produce. See n. 5, *supra*. And, as the Court of Appeals recognized, the Government fails to "connect casino gambling and compulsive gambling with broadcast advertising for casinos"—let alone broadcast advertising for non-Indian commercial casinos. 149 F. 3d, at 339.[6]

---

[6] The Government cites several secondary sources and declarations that it put before the Federal District Court in New Jersey and, as an alternative to affirming the judgment below, requests a remand so that it may have another chance to build a record in the Fifth Circuit. Remand is inappropriate for several reasons. First, the Government had ample opportunity to enter the materials it thought relevant after we vacated the Fifth Circuit's first ruling and remanded for reconsideration in light of *44 Liquormart*. Second, the Government's evidence did not convince the New Jersey court that § 1304 could be constitutionally applied in circumstances similar to this case, see *Players Int'l, Inc.* v. *United States*, 988

We need not resolve the question whether any lack of evidence in the record fails to satisfy the standard of proof under *Central Hudson,* however, because the flaw in the Government's case is more fundamental: The operation of § 1304 and its attendant regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it. See *Rubin,* 514 U. S., at 488. Under current law, a broadcaster may not carry advertising about privately operated commercial casino gambling, regardless of the location of the station or the casino. 18 U. S. C. § 1304; 47 CFR § 73.1211(a) (1998). On the other hand, advertisements for tribal casino gambling authorized by state compacts—whether operated by the tribe or by a private party pursuant to a management contract—are subject to no such broadcast ban, even if the broadcaster is located in, or broadcasts to, a jurisdiction with the strictest of antigambling policies. 25 U. S. C. § 2720. Government-operated, nonprofit, and "occasional and ancillary" commercial casinos are likewise exempt. 18 U. S. C. § 1307(a)(2).

The FCC's interpretation and application of §§ 1304 and 1307 underscore the statute's infirmity. Attempting to enforce the underlying purposes and policy of the statute, the FCC has permitted broadcasters to tempt viewers with claims of "Vegas-style excitement" at a commercial "casino," if "casino" is part of the establishment's proper name and the advertisement can be taken to refer to the casino's amenities,

---

F. Supp. 497, 502–503, 506–507 (1997), and most of the sources that the Government cited in the New Jersey litigation were also presented to the Fifth Circuit, see Supplemental Brief for Appellees in No. 94–30732 (CA5), pp. iv–v. Indeed, the Government presented sources to the Fifth Circuit not provided to the New Jersey court, and the Fifth Circuit relied on material that the Government had not proffered. In any event, as we shall explain, additional evidence to support the Government's factual assertions in this Court cannot justify the scheme of speech restrictions currently in effect.

rather than directly promote its gaming aspects.[7]   While we can hardly fault the FCC in view of the statute's focus on the suppression of certain types of information, the agency's practice is squarely at odds with the governmental interests asserted in this case.

From what we can gather, the Government is committed to prohibiting accurate product information, not commercial enticements of all kinds, and then only when conveyed over certain forms of media and for certain types of gambling— indeed, for only certain brands of *casino* gambling—and despite the fact that messages about the availability of such gambling are being conveyed over the airwaves by other speakers.

Even putting aside the broadcast exemptions for arguably distinguishable sorts of gambling that might also give rise to social costs about which the Federal Government is concerned—such as state lotteries and parimutuel betting on horse and dog races, § 1307(a)(1)(B); 28 U. S. C. § 3704(a)— the Government presents no convincing reason for pegging its speech ban to the identity of the owners or operators of the advertised casinos.   The Government cites revenue needs of States and tribes that conduct casino gambling, and notes that net revenues generated by the tribal casinos are dedicated to the welfare of the tribes and their members. See 25 U. S. C. §§ 2710(b)(2)(B), (d)(1)(A)(ii), (2)(A).   Yet the Government admits that tribal casinos offer precisely the same types of gambling as private casinos.   Further, the Solicitor General does not maintain that government-operated casino gaming is any different, that States cannot derive revenue from taxing private casinos, or that any one class

---

[7] See, *e. g., Letter to DR Partners*, 8 FCC Rcd. 44 (1992); *In re WTMJ, Inc.*, 8 FCC Rcd. 4354 (1993) (disapproving of the phrase "Vegas style games"); see also 2 Record 493, 497–498 (Mass Media Bureau letter to Forbes W. Blair, Apr. 10, 1987) (concluding that a proposed television commercial stating that the "odds for fun are high" at the sponsor's establishment would be lawful); *id.*, at 492, 500–501.

of casino operators is likely to advertise in a meaningfully distinct manner from the others. The Government's suggestion that Indian casinos are too isolated to warrant attention is belied by a quick review of tribal geography and the Government's own evidence regarding the financial success of tribal gaming. See n. 5, *supra*. If distance were determinative, Las Vegas might have remained a relatively small community, or simply disappeared like a desert mirage.

Ironically, the most significant difference identified by the Government between tribal and other classes of casino gambling is that the former is "heavily regulated." Brief for Respondents 38. If such direct regulation provides a basis for believing that the social costs of gambling in tribal casinos are sufficiently mitigated to make their advertising tolerable, one would have thought that Congress might have at least experimented with comparable regulation before abridging the speech rights of federally *un*regulated casinos. While Congress' failure to institute such direct regulation of private casino gambling does not necessarily compromise the constitutionality of § 1304, it does undermine the asserted justifications for the restriction before us. See *Rubin*, 514 U. S., at 490–491. There surely are practical and nonspeech-related forms of regulation—including a prohibition or supervision of gambling on credit; limitations on the use of cash machines on casino premises; controls on admissions; pot or betting limits; location restrictions; and licensing requirements—that could more directly and effectively alleviate some of the social costs of casino gambling.

We reached a similar conclusion in *Rubin*. There, we considered the effect of conflicting federal policies on the Government's claim that a speech restriction materially advanced its interest in preventing so-called "strength wars" among competing sellers of certain alcoholic beverages. We concluded that the effect of the challenged restriction on commercial speech had to be evaluated in the context of the entire regulatory scheme, rather than in isolation,

and we invalidated the restriction based on the "overall irrationality of the Government's regulatory scheme." *Id.*, at 488. As in this case, there was "little chance" that the speech restriction could have directly and materially advanced its aim, "while other provisions of the same Act directly undermine[d] and counteract[ed] its effects." *Id.*, at 489. Coupled with the availability of other regulatory options which could advance the asserted interests "in a manner less intrusive to [petitioners'] First Amendment rights," we found that the Government could not satisfy the *Central Hudson* test. *Id.*, at 490–491.

Given the special federal interest in protecting the welfare of Native Americans, see *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202, 216–217 (1987), we recognize that there may be valid reasons for imposing commercial regulations on non-Indian businesses that differ from those imposed on tribal enterprises. It does not follow, however, that those differences also justify abridging non-Indians' freedom of speech more severely than the freedom of their tribal competitors. For the power to prohibit or to regulate particular conduct does not necessarily include the power to prohibit or regulate speech about that conduct. *44 Liquormart*, 517 U. S., at 509–511 (opinion of STEVENS, J.); see *id.*, at 531–532 (O'CONNOR, J., concurring in judgment); *Rubin*, 514 U. S., at 483, n. 2. It is well settled that the First Amendment mandates closer scrutiny of government restrictions on speech than of its regulation of commerce alone. *Fox*, 492 U. S., at 480. And to the extent that the purpose and operation of federal law distinguishes among information about tribal, governmental, and private casinos based on the identity of their owners or operators, the Government presents no sound reason why such lines bear any meaningful relationship to the particular interest asserted: minimizing casino gambling and its social costs by way of a (partial) broadcast ban. *Discovery Network*, 507 U. S., at 424, 428. Even under the degree of scrutiny that we have

applied in commercial speech cases, decisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment. Cf. *Carey* v. *Brown*, 447 U. S. 455, 465 (1980); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 777, 784–785 (1978).

The second interest asserted by the Government—the derivative goal of "assisting" States with policies that disfavor private casinos—adds little to its case. We cannot see how this broadcast restraint, ambivalent as it is, might directly and adequately further any *state* interest in dampening consumer demand for casino gambling if it cannot achieve the same goal with respect to the similar *federal* interest.

Furthermore, even assuming that the state policies on which the Federal Government seeks to embellish are more coherent and pressing than their federal counterpart, § 1304 sacrifices an intolerable amount of truthful speech about lawful conduct when compared to all of the policies at stake and the social ills that one could reasonably hope such a ban to eliminate. The Government argues that petitioners' speech about private casino gambling should be prohibited in Louisiana because, "under appropriate conditions," 3 Record 628, citizens in neighboring States like Arkansas and Texas (which hosts tribal, but not private, commercial casino gambling) might hear it and make rash or costly decisions. To be sure, in order to achieve a broader objective such regulations may incidentally, even deliberately, restrict a certain amount of speech not thought to contribute significantly to the dangers with which the Government is concerned. See *Fox*, 492 U. S., at 480; cf. *Edge*, 509 U. S., at 429–430.[8] But Congress' choice here was neither a rough

---

[8] As we stated in *Edge:* "[A]pplying the restriction to a broadcaster such as [respondent] directly advances the governmental interest in enforcing the restriction in nonlottery States, while not interfering with the policies of lottery States like Virginia . . . . [W]e judge the validity of the restriction in this case by the relation it bears to the general problem of accom-

approximation of efficacy, nor a reasonable accommodation of competing state and private interests. Rather, the regulation distinguishes among the indistinct, permitting a variety of speech that poses the same risks the Government purports to fear, while banning messages unlikely to cause any harm at all. Considering the manner in which § 1304 and its exceptions operate and the scope of the speech it proscribes, the Government's second asserted interest provides no more convincing basis for upholding the regulation than the first.

## VI

Accordingly, respondents cannot overcome the presumption that the speaker and the audience, not the Government, should be left to assess the value of accurate and nonmisleading information about lawful conduct. *Edenfield*, 507 U. S., at 767. Had the Federal Government adopted a more coherent policy, or accommodated the rights of speakers in States that have legalized the underlying conduct, see *Edge*, 509 U. S., at 428, this might be a different case. But under current federal law, as applied to petitioners and the messages that they wish to convey, the broadcast prohibition in 18 U. S. C. § 1304 and 47 CFR § 73.1211 (1998) violates the

modating the policies of both lottery and nonlottery States." 509 U. S., at 429–430. The Government points out that *Edge* hypothesized that Congress "might have" held fast to a more consistent and broader anti-gambling policy by continuing to ban all radio or television advertisements for state-run lotteries, even by stations licensed in States with legalized lotteries. *Id.*, at 428. That dictum does not support the validity of the speech restriction in this case. In that passage, we identified the actual federal interest at stake; we did not endorse any and all nationwide bans on nonmisleading broadcast advertising related to lotteries. As the Court explained, "Instead of favoring either the lottery or the nonlottery State, Congress opted to" accommodate the policies of both; and it was "[t]his congressional policy of balancing the interests of lottery and nonlottery States" that was "the substantial governmental interest that satisfie[d] *Central Hudson*." *Ibid.*

First Amendment. The judgment of the Court of Appeals is therefore

*Reversed.*

CHIEF JUSTICE REHNQUIST, concurring.

Title 18 U. S. C. § 1304 regulates broadcast advertising of lotteries and casino gambling. I agree with the Court that "[t]he operation of § 1304 and its attendant regulatory regime is so pierced by exemptions and inconsistencies," *ante*, at 190, that it violates the First Amendment. But, as the Court observes:

> "There surely are practical and nonspeech-related forms of regulation—including a prohibition or supervision of gambling on credit; limitations on the use of cash machines on casino premises; controls on admissions; pot or betting limits; location restrictions; and licensing requirements—that could more directly and effectively alleviate some of the social costs of casino gambling." *Ante*, at 192.

Were Congress to undertake substantive regulation of the gambling industry, rather than simply the manner in which it may broadcast advertisements, "exemptions and inconsistencies" such as those in § 1304 might well prove constitutionally tolerable. "The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483, 489 (1955) (citations omitted).

But when Congress regulates commercial speech, the *Central Hudson* test imposes a more demanding standard

of review. I agree with the Court that that standard has not been met here, and I join its opinion.

JUSTICE THOMAS, concurring in the judgment.

I continue to adhere to my view that "[i]n cases such as this, in which the government's asserted interest is to keep legal users of a product or service ignorant in order to manipulate their choices in the marketplace," the *Central Hudson* test should not be applied because "such an 'interest' is *per se* illegitimate and can no more justify regulation of 'commercial speech' than it can justify regulation of 'noncommercial' speech." *44 Liquormart, Inc.* v. *Rhode Island,* 517 U. S. 484, 518 (1996) (opinion concurring in part and concurring in judgment). Accordingly, I concur only in the judgment.