**NORTHERN INDIANA GUN & OUTDOOR SHOWS, INC., Plaintiff,**

**v.**

**Brian HEDMAN and, Karl King, Defendants.**

**No. 3:96–CV–842RM.**

United States District Court, N.D. Indiana, South Bend Division.

May 8, 2000.

Jay T Hirschauer, Hirschauer and Hirschauer, Logansport, IN, for Northern Indiana Gun & Outdoor Shows, Inc., plaintiffs.

Thomas L Bodnar, Robert C Rosenfeld, South Bend, IN, for City of South Bend, Stephen Luecke, Brian R Hedman.

### MEMORANDUM AND ORDER

MILLER, District Judge.

The Northern Indiana Gun and Outdoor Show ("NIGOS") filed this cause of action seeking to hold the defendants liable for violation of its constitutional rights pursu-ant to 42 U.S.C. § 1983. On January 14, 2000, a jury returned a verdict for NIGOS determining that its constitutional rights had been violated by Brian Hedman and Karl King, officials of the Century Center Board of Managers, when Mr. Hedman imposed and enforced, and Mr. King approved, imposition and enforcement of a "no guns on the premises" policy at Century Center. The jury instructions addressed four theories of liability: abridgement of political speech through a content-based policy; abridgement of political speech through a content-neutral policy; abridgement of commercial speech; and equal protection violation. Neither the jury instructions nor the verdict form required the jury to specify the theory under which it reached its decision. By its complaint, NIGOS also sought a permanent injunction, and today, the court denies that relief.

Permanent injunctive relief is appropriate if the party seeking a permanent injunction establishes that "(1) the applicable substantive law supports the party seeking the injunction, (2) the party seeking the injunction has no adequate remedy at law, and (3) the public interest would not be harmed by the requested injunction." *Civil City of South Bend, Ind. v. Consolidated Rail Corp.*, 880 F.Supp. 595, 599 (N.D.Ind.1995). The jury in this case found that at least one of the theories of applicable substantive law supports the NIGOS request for seeking an injunction. NIGOS does not argue which of the substantive theories supports its request, but relies on the jury's finding for NIGOS as proof of the first element for injunctive relief that the substantive law supports its request. NIGOS cites *Sostre v. Rockefeller,* 312 F.Supp. 863, 884 (S.D.N.Y.1970), in support of its position, but the court believes the issue is more complicated than NIGOS suggests. In *Sostre,* the trial on the merits was a bench trial, and the court's findings and conclusions made clear exactly what constitutional violations occurred that warranted injunctive relief.

That court already had found that the plaintiff has shown each of the required elements for injunctive relief, and this court must make such a finding as well. *See Al–Alamin v. Gramley,* 926 F.2d 680, 685 (7th Cir.1991) (federal court powers to remedy a constitutional violation require the court to initially "find that a constitutional violation exists").

■ When issues are tried jointly to the bench and a jury, the court ordinarily is bound by the jury's findings on fact issues common to both decisions. *See, e.g., Artis v. Hitachi Zosen Clearing. Inc.,* 967 F.2d 1132, 1138 (7th Cir.1992); *Daniels v. Pipefitters' Ass'n Local Union No. 597,* 945 F.2d 906, 923 (7th Cir.1991). Here, however, the court cannot be confident what the jury found. In final argument, counsel for NIGOS told the jury (without objection from the defendants or correction by the court) that the jurors did not have to agree on precisely how NIGOS's rights were violated, as long as each juror believed that the defendants violated at least one of NIGOS's rights. Accordingly, given the four discrete constitutional theories submitted to the seven-member jury, it is conceivable that no majority (much less unanimity) existed on any of NIGOS's claims. The court owes the jury's general verdict considerable deference, but the court cannot say with confidence what findings the jury made to reach its verdict. Accordingly, the court turns to its fact-finding tasks with deference to the jury's findings, but with lesser obeisance than ordinarily would be paid to the verdict.

### Facts

The Century Center is a multi-use facility created by IND. CODE 36–10–10, and is advertised as being available for trade shows, conventions, meetings, banquets, exhibits, receptions, and entertainment events. More often than not, multiple events occur simultaneously at the Century Center. The Century Center houses three convention halls, a recital hall, a ballroom, a theatre, a "grand room" multipurpose courtyard, an art museum, art museum classrooms, two gift shops, and South Bend School Corporation classrooms. It is financed in part by the City of South Bend and is a municipal facility and was and is open as a public forum.

NIGOS is an Indiana corporation that sponsors gun and outdoor shows. Its income is generated through booth rental and admission fees. NIGOS enjoyed the use of Century Center to conduct gun shows at Century Center through January 1994. At each Century Center show, NIGOS rented at least 400 booths to exhibitors who sold firearms, sporting goods, camping equipment and food, and jewelry; NIGOS had an increasing attendance of about 5,000 people per show. NIGOS also conducted guns shows in South Bend at Union Station and the 4–H building at the fairgrounds.

Rick Croiser and Joy Croiser are gun show promoters and NIGOS's officers and principal stockholders. Mr. and Mrs. Croiser are also antique gun dealers, but their gun dealing is entirely separate from the work they do as promoters for NIGOS in putting on the gun shows. The Crosiers preferred the Century Center for NIGOS gun shows for financial reasons: it was larger than Union Station and it was a better location and a more convenient facility than the 4–H building. NIGOS lost quite a bit of income by not being able to promote the gun shows at the Century Center and was financially devastated when it lost Century Center as a venue.

NIGOS required all exhibitors to read and agree in writing to show rules that included safety requirements regarding ammunition, tie-downs that disabled firearms, and loaded firearms. The show rules forms clearly indicated that safety was the prime concern. NIGOS security checked all declared firearms at entry points to ensure that they were not loaded and that they were disabled. Attendees occasionally tried to enter the show with a loaded firearm, but would unload the firearm before being allowed to enter. At all times that NIGOS promoted gun shows at the Century Center, safety violations were

minimal. NIGOS did not check the exhibitors or the attendees of the show regarding permits or licenses that may be required to buy, sell, or carry firearms.

The National Rifle Association had a booth at the NIGOS gun shows, recruited members at the gun shows, and informed members of its position on legislation at the gun shows. NIGOS waived admission fees to the gun show if individuals joined the NRA or renewed their membership at the show.[1] The inconvenience of the 4-H building cut the NRA's recruiting efforts a bit.

Gun dealers who purchased booths from NIGOS offered firearms for sale and engaged in non-misleading speech regarding the sales of firearms.

NIGOS held a gun show in the Century Center in January 1994. Mr. Hedman saw a dealer with a rifle that was not tied down, refuse barrels containing paper refuse in the vicinity of people smoking, and gun show attendees wandering with guns through Century Center areas that were not covered by NIGOS or Century Center security. Mr. Hedman was concerned about fire hazards and hundreds of people with firearms walking throughout the unsecured areas of the Century Center. The concerns based on his personal observations combined with information given to him by his chief of security led him to the conclusion that there could not safely be a gun show at the Century Center. Mr. Hedman discussed the liability issues with legal counsel. On January 31, 1994, believing there to be a safety issue, Mr. Hedman wrote a letter to NIGOS instituting a "no guns on the premises" policy, which then contravened Century Center's written policy, which allowed firearms as a part of a related firearms show or exhibit.[2]

The Century Center Board of Managers unanimously approved Mr. Hedman's actions on April 20, 1994. In his January 31, 1994 and September 6, 1996, letters to NIGOS, Mr. Hedman indicated that the Century Center looked forward to doing business with NIGOS, but that any shows would have to be in accordance with the policy prohibiting firearms and ammunition on the premises.

While Mr. Hedman testified that he believed that a gun show could be held without guns or ammunition present, the overwhelming testimony was that considerably fewer people would attend such a gun show.

The defendants ask the court to consider additional evidence in deciding whether to grant prospective relief: a South Bend ordinance[3] and the proposed testimony submitted in affidavit form of Mr. Robert Candler, the Director of Safety and Security for Century Center from spring 1992 through fall 1994. NIGOS did not object to the request, but the court needn't reopen the evidence to decide the permanent injunction issue, so the court denies. the request.

### Political Speech

To prevail on its First Amendment claims based on abridgment of political speech, NIGOS had to demonstrate that the defendants enforced the "no weapons on the premises" policy because of the specific message or viewpoint NIGOS expressed or because of an intent to single out constitutionally protected political speech (content-based regulation) or that the policy unreasonably restricted the time, place, or manner of political speech (content-neutral). The defendants argue that the policy regulates the conduct of

---

1. How many patrons actually received free admission on these terms is unknown—NIGOS did not adjust, or did not show the adjustment, of its gate income due to NRA membership drives and renewals at NIGOS shows.

2. This provision in the policy manual was changed in 1997 to reflect the "no weapons

on the premises" policy instituted by Mr. Hedman.

3. The parties stipulated to the authenticity of City Ordinance 8468–94 at trial, but the ordinance was excluded in the face of objections under Rules 402 and 403 of the Federal Rule of Evidence.

taking guns into the Century Center— conduct that is not expressive in nature and does not convey a particular message—and that the conduct is not protected speech.

■ If the challenged policy does not regulate expression in some manner, the First Amendment is not implicated. *See Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). To be labeled speech, conduct must be undertaken with " '[a]n intent to convey a particularized message ... [and] the likelihood ... that the message would be understood by those who viewed it.' " *Id.* (quoting *Spence v. State of Wash.,* 418 U.S. 405, 410–411, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)). NIGOS, as the plaintiff, bears the burden of establishing that the conduct contains an expressive component. *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies.").

In its request for injunctive relief, NIGOS pointed to no law establishing that the "no weapons on the premises" constitutes an abridgement of expressive activity, but filed the final judgment in the *HC Gun & Knife Shows, Inc.* Civil Action No. H–96–0536 (S.D.Tex., November 17, 1997) and cited *HC Gun & Knife Shows, Inc. v. City of Houston,* 201 F.3d 544 (5th Cir. 2000) as supplemental authority on the issue. The final judgment in *HC Gun & Knife Shows, Inc.* enjoins the city from enforcing an ordinance that required that all firearms at gun shows have their firing pins removed or have trigger locks installed and required that all persons who attended the gun show sign a form setting forth a declaration of weapons in their possession. The judgment declared that state law preempted the city ordinance and that the city ordinance violated the

First Amendment of the United States Constitution and the state constitution. The Fifth Circuit affirmed the district court on the preemption ground, but said that because the ordinance was preempted, "we need not reach the federal and state commercial speech constitutional issues." *HC Gun & Knife Shows, Inc.,* 201 F.3d at 548 (citing *County Court of Ulster County, N.Y. v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (court has "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration")).

■ In an earlier ruling in this case, *see Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* No. 3:96–CV–842RM (N.D.Ind., February 11, 1998) *rev'd on other grounds,* 163 F.3d 449 (7th Cir.1998), the court determined that while the district court in *HC Gun & Knife Shows, Inc.* held the city's ordinance an improper restriction on commercial speech, it "did not specifically consider whether the regulated conduct contained an expressive component; rather, the court proceeded directly to whether the speech at issue constituted commercial speech for First Amendment purposes." This court further determined that the opinion left "it unclear whether the city defended the ordinance as a proper restriction of non-expressive conduct" and that if it did not, the *HC Gun & Knife Shows, Inc.* district court conclusion on this matter was of "little value to this court" as to the abridgment of political speech claims. Nothing in NIGOS's brief or supplemental authority convinces the court otherwise.

■ Trial testimony indicated that gun show patrons took guns to gun shows to have them repaired, to sell them to others, and to show them off to others at the show. There was no testimony at trial from which it could be concluded that having guns on the premises conveyed a particular message to anyone. NIGOS has not carried its burden of demonstrating

that the conduct that the defendants seek to regulate at the Century Center contains an expressive component; accordingly, NIGOS has not shown that the First Amendment supports injunctive relief.

### Commercial Speech

■ To survive First Amendment scrutiny, a restriction on commercial speech must: (1) concern lawful activity; (2) be truthful; (3) directly advance a substantial governmental interest; and (4) be no more extensive than necessary to serve that interest. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *see also Greater New Orleans Broadcasting Ass'n, Inc. v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (applying the *Central Hudson* test to a commercial speech case); *Pearson v. Edgar,* 153 F.3d 397 (7th Cir. 1998) (same).

■ An offer to sell firearms at a gun show concerns lawful activity, and case law supports the conclusion that "a proposal to engage in such a transaction is protected as commercial speech under the First Amendment." *Nordyke v. Santa Clara County,* 110 F.3d 707, 711 (9th Cir.1997). But the "conclusion that speech is 'commercial,' and that it concerns lawful activity, does not mean that it enjoys unqualified First Amendment protection." *Id.*

■ In *Nordyke v. Santa Clara County,* gun show entrants Sallie Ann and Russell Nordyke challenged an addendum to the lease between Santa Clara County and its lessee, the Santa Clara County Fairgrounds Management Corporation, on the grounds that it infringed the First Amendment's protection of the commercial speech that accompanied Management Corporation's gun shows. *Id.* at 713. The lease addendum's language prohibited gun shows at the fairgrounds, and a letter explaining the addendum stated that Santa Clara County's intention was to "prohibit any person from selling, offering for sale, supplying, delivering, or giving possession or control of firearms or ammunition to any other person at a gun show at the fairgrounds." *Id.* at 708–709. The ban's purposes were "to 'avoid sending the wrong message to the community relative to support of gun usage,' 'to improve the Fairgrounds' image,' and to reduce 'the fiscal impact of criminal justice activities in response to gun-related violence.'" *Id.* at 709.

After deciding that the prohibited activity amounted to commercial speech, the Ninth Circuit decided that while "the government has a substantial interest in protecting the people from those who acquire guns illegally and use them to commit crimes resulting in injury or death of their victims," the lease addendum did not improve public safety. *Id.* at 713. The Ninth Circuit doubted that the unwanted misperception within the community that the county promotes gun usage by allowing gun shows at the fairgrounds qualified as a substantial interest, but if it were, the county did not present "a shred of evidence" that gun shows at the fairgrounds caused or reinforced that mistaken view in any county resident. Because the county couldn't meet the third and fourth prongs of the *Central Hudson* test, the Ninth Circuit agreed that the addendum was contrary to the First Amendment.

The Croisers are antique gun dealers, but their gun-dealing business is separate from NIGOS's gun show promoting business, and NIGOS, not the Croisers or gun show entrants, is the plaintiff in this case. To the extent that promoting the sale of guns and offering booth space to those who sold guns and other outdoor goods, rather than the offering of guns for sale, is commercial speech, NIGOS engaged in commercial speech. The "no guns on the premises" policy doesn't prohibit NIGOS from promoting gun sales or from offering booth space to those who sell guns, but the overwhelming testimony at trial supports the conclusion that a ban on firearms and ammunition at a gun show effectively ended gun shows at the Century Center. The ban prevents NIGOS from offering what it

has to sell and it concerns legal activity, so the first two prongs of the *Central Hudson* test are met.

The partial summary judgment order in *HC Gun & Knife Shows, Inc.* Civil Action No. H–96–0536 (S.D.Tex., January 23, 1997), concluded that the city lacked a substantial state interest in regulating firearms transactions because of state preemption of the area. The court also decided that apart from state preemption, the city's claimed substantial interest of "preventing the discharge of firearms within City limits, especially on City property" was not a real harm at a gun show when (1) the plaintiffs did not discharge firearms at their gun shows; (2) the city presented no evidence that there have been discharges at gun shows; or (3) that its ordinance would eliminate or even substantially reduce the number of discharges that had occurred in the past.

Whether the "no guns on the premises" policy in this case directly advances the stated governmental interest in providing a reasonably safe convention center and whether the policy is no more extensive than necessary to serve that interest are close questions, but the court believes the policy survives those inquiries. The testimony from people who provided and supervised security at the gun show conflicted as to whether safety is a concern at gun shows with guns and ammunition. The court finds that the city's concerns about safety in the Century Center are valid concerns and constitute a substantial governmental interest. The court also finds that the "no weapons or ammunition on the premises" policy serves that interest narrowly.

NIGOS rented convention halls A, B, and C in the Century Center and the area in front of halls A and B. NIGOS hired ten security people (eight of whom were Century Center personnel) to work the show. In December 1993, Mr. Hedman spoke to Mr. Croiser about safety issues—risks of persons being injured and risks of fire. Because of these concerns, Mr. Hedman went unannounced to the January 1994 gun show to check the security and safety of the show. He was concerned with the number of people at the show, the inability of the security forces to control the gun show entrants as they wandered throughout the Century Center (25 to 50% of whom came to the show with firearms), the potential risk of injury to Century Center patrons in a fire emergency, and the inability of Century Center to recover should an incident involving firearms or a fire occur. Mr. Hedman saw people smoking near refuse barrels and with the hundreds of exhibitor tables with tablecloths and draperies separating the booths (he didn't know if they were made of fire retardant materials), and saw what he believed to be a fire hazard. He believed ammunition would explode in a fire and compound fire panic problems. He spoke with Mr. Croiser at the January 1994 show about his concerns of the smoking near refuse barrels, about his sighting of firearms without tie-downs, and about a concern based on a report from his security chief.

Several South Bend police officers who worked security at the gun shows testified that there was no safety issue at the Century Center. Those officers (and others) manned the gate, asked gun show entrants if they had firearms, and tied down those firearms that the entrants admitted having. Mark Mersich, Mark Chabot, and Gene Mikolajewski, current and former South Bend Police officers who worked security at the gun shows for either NIGOS or the Century Center, testified that although a large sign with bold lettering declaring the prohibition of loaded weapons in the Century Center was posted at a point before the entrance, gun show entrants occasionally had to be told to unload their weapons at the gate because they disregarded the posted prohibition. The NIGOS gun show rules that clearly told exhibitors in bold lettering that "All guns must have tie-downs," and exhibitors were required to read and agree to abide by the rule, and Mr. Croiser testified that NIGOS sent officers around to check that exhibitors followed the tie-down rule. Still, Mr.

Hedman saw a rifle at an exhibitor's booth without a tie-down at the January 1994 gun show, and Mr. Mikolajewski testified that "his people" (the Century Center security personnel, which were 8 of the 10 security personnel at the show) were not directed to ensure that exhibitors' firearms were tied down. Mr. Merish, who worked security for NIGOS, testified that his people provided tie-downs for the exhibitors, but that they did not tie down the exhibitors' firearms or check that the exhibitors followed the tie-down policy.

Allan Abramow presented expert trial testimony that ammunition is not a safety hazard, an opinion he based on his own tests, articles, and tests done by others. The articles relied on by Mr. Abramow did not conclude that ammunition in a fire is not a hazard, but concluded that ammunition doesn't pose a hazard to firefighters and bystanders in case of a fire in a home (article by Maj. Gen. Julian S. Hatcher, U.S.A. retired) and that with a minimum of protective gear, firefighters should not be overly concerned about unconfined ammunition exploding near them (article by Gary D. Sciuchetti). Mr Abramow's own test consisted of building a fire and burning eight cartridges under the cover of a cardboard box. Mr. Abramow testified that ammunition in a fire would explode with the bang of a firecracker, but that the projectiles would not go far or fast enough to pose a hazard to firefighters. Although he concluded that the velocity of the shrapnel that resulted from the exploded cartridges would not pose a hazard to firefighters, some pieces of shrapnel pierced the cardboard box and could not be found.

Mr. Hedman did not fear only for firefighter safety if smoking in exhibitor booths with tablecloths and draperies and near refuse barrels containing paper led to a fire; he also feared the safety of panicked patrons—those attending the gun shows and other Century Center patrons—as they rushed to escape. He also feared the risk of injury to persons in the Century Center given the vast numbers of patrons with weapons who wandered through the unsecured areas of the Centu-

ry Center. Based on what Mr. Hedman saw at the January 1994 show and the concerns of his security manager, Mr. Hedman spoke with Mr. Croiser and then with legal counsel regarding the risks. After discussion with legal counsel, Mr. Hedman wrote NIGOS and informed it of the "no firearms and ammunition" policy at the Century Center.

The Century Center has a legal duty to provide a reasonably safe premises for its patrons. *See City of Bloomington v. Kuruzovich,* 517 N.E.2d 408 (Ind.Ct.App. 1987). To the extent Mr. Hedman feared that patrons would be wounded by exploding cartridges in the event of a fire, Mr. Abramow's testimony shows Mr. Hedman was wrong. Mr. Abramow's testimony does not, however, vitiate Mr. Hedman's concern that exploding ammunition would significantly increase the risk of panic in a fire and turn the fire's management into a major disaster; that concern is reasonable, relates to a substantial government interest, and is unrelated to speech. Mr. Hedman's concern for the risk posed to Century Center patrons from an armed patron in an unsecured area also is a substantial governmental interest.

The policy is no more restrictive than necessary. Unlike the city ordinance in *HC Gun & Knife Shows, Inc.,* the policy in this case does not attempt to regulate gun show activity in the city: it prevents weapons and ammunition from coming into one city building. A no-smoking policy at the gun shows could reduce the fire-related concerns greatly, but other less restrictive policies already have failed to address the remaining safety concerns: patrons and exhibitors alike violated the posted and acknowledged rules about loaded weapons and tie-downs. The safety of non-gun show patrons might be assured by requiring NIGOS to rent the entire Century Center for its shows, but trial evidence showed that other groups (such as the art museum and the school corporation) have claims on Century Center that would prevent such an arrangement. The court be-

lieves that the evidence at trial showed the policy to be Mr. Hedman's last resort. The third and fourth prongs of the *Central Hudson* test are met. The "no guns or ammunition" policy does not violate the First Amendment protections of commercial speech.

### Equal Protection

To establish its claim that the defendants violated NIGOS's right to equal protection, NIGOS must show that the Century Center treated NIGOS differently from equal persons or organization and that the "no weapons on the premises" policy of the Century Center either had no legitimate governmental purpose or did not have even a rational relationship to its legitimate governmental purpose. *See National Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1127–1129 (7th Cir.1995) (applying equal protection standard to economic regulation). Already having determined that the defendants have articulated a substantial governmental interest and that the policy materially advanced that purpose, the court finds the equal protection claim without merit.

### Conclusion

For the reasons stated above, the court:

(1) DENIES the NIGOS request for permanent injunction;

(2) DENIES the defendants' request for additional hearing on the evidence [Docket No. 152];

(3) DENIES AS MOOT the plaintiff's motion for the court to enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure [Docket No. 154];

(4) DENIES the plaintiff's request for a status hearing [Docket No. 155]; and

(5) DIRECTS the clerk to enter judgment for the plaintiff on the jury verdict in the amount of $300,000.

SO ORDERED.