*426 CARL E. STEWART, Chief Judge,
dissenting:
I agree with the majority’s conclusion that the Charities have standing to bring this suit. However, because I conclude that the Bingo Act’s political advocacy restrictions are facially invalid, I would affirm the district court’s judgment and permanently enjoin enforcement of the subject provisions. I therefore respectfully dissent from the majority’s opinion upholding the restrictions as permissible conditions on a government subsidy.
The Bingo Act does not provide the Charities with a government “subsidy,” as that concept is understood in the Supreme Court’s jurisprudence, simply because there is no direct or indirect grant of public funds or other in-kind benefit to the Charities. Accordingly, the Act’s political speech restrictions constitute unconstitutional conditions on a governmental benefit, ¿a, a license to conduct bingo games, because they fail to survive strict scrutiny.
I.
The majority holds that “the Bingo Act’s political advocacy restrictions fall within government’s power to subsidize some activities to the exclusion of others and therefore does not penalize political speech.” Ante, at 424. This conclusion is rooted in the Supreme Court’s jurisprudence regarding the government’s power to attach conditions to its allocation of public funds, which, in the case of the federal government, arises from Congress’s spending power.
The Spending Clause of the United States Constitution authorizes Congress “[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defen[s]e and general Welfare of the United Statesf.]” U.S. Const, art. I, § 8, cl. 1. “The Clause provides Congress broad discretion to tax and spend for the ‘general Welfare,’ including by funding particular state or private programs or activities. That power includes the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends.” Agency for Int’l Dev. v. Alliance for Open Soc’y Int'l Inc., — U.S.-, 133 S.Ct. 2321, 2327-28, 186 L.Ed.2d 398 (2013) (citation omitted); see also South Dakota v. Dole, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (“Incident to this [spending] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power ‘to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.’ ” (citations omitted)). State legislatures likewise have broad latitude in exercising their spending powers. See Leathers v. Medlock, 499 U.S. 439, 451, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991) (citing to cases recognizing this broad authority). “As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient’s exercise of its First Amendment rights.” Alliance for Open Soc’y, 133 S.Ct. at 2328 (citations omitted).
II.
The majority relies on two Supreme Court cases for its holding that the Bingo Act imposes permissible speech restrictions on a government subsidy: Regan v. Taxation With Representation of Washington, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), and Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). I discuss each in turn.
In Regan, the Supreme Court held that the Internal Revenue Code’s (“Code”) *427 grant of tax exemption for certain nonprofit organizations, and its denial of tax-deductible contributions to those that do not engage in substantial lobbying activities, do not violate the First Amendment. 461 U.S. at 542-51, 103 S.Ct. 1997. At issue in Regan were two provisions of the Code, sections 501(c)(3) and 501(c)(4). See Regan, 461 U.S. at 542-44, 103 S.Ct. 1997 (citing 26 U.S.C. §§ 501(c)(3), (4)).[1] Section 501(c)(3) grants tax exemption to certain nonprofit organizations “no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation ... and which does not participate in, or intervene in ..., any political campaign on behalf of (or in opposition to) any candidate for public office.” In turn, 26 U.S.C. § 170(c)(2) allows taxpayers who contribute to these 501(c)(3) organizations to deduct the amount of their contributions on their federal income tax returns. On the other hand, Section 501(c)(4) grants tax-exempt status to certain nonprofit organizations, but contributions to these 501(c)(4) organizations are not tax-deductible. Unlike Section 501(c)(3) organizations, Section 501(c)(4) organizations are allowed to engage in substantial lobbying to advance their exempt purposes. Regan, 461 U.S. at 543, 103 S.Ct. 1997. The plaintiff in Regan, Taxation With Representation (“TWR”), challenged the prohibition against substantial lobbying under Section 501(c)(3) “because it want[ed] to use tax-deductible contributions to support substantial lobbying activities.” Id. at 543-44, 103 S.Ct. 1997.
The Court upheld the Code’s lobbying restrictions as a permissible condition on a government subsidy. Regan, 461 U.S. at 543-46, 103 S.Ct. 1997. In so holding, the Court explained the effect of the tax exemption system:
Both tax exemptions and tax-deductibility are a form' of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income. Deductible contributions are similar to cash grants of the amount of a portion of the individual’s contributions. The system Congress has enacted provides this kind of subsidy to non profit civic welfare organizations generally, and an additional subsidy to those charitable organizations that do not engage in substantial lobbying. In short, Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non profit organizations ' undertake to promote the public welfare.
Id. at 544, 103 S.Ct. 1997 (footnote omitted).
The Code allows a 501(c)(3) organization to create a 501(c)(4) organization to conduct its lobbying activities, a structure TWR previously had in place. Regan, 461 U.S. at 544, 103 S.Ct. 1997. Importantly, the Court noted, however, that a Section 501(c)(3) organization could not subsidize its Section 501(c)(4) affiliate because “public funds might be spent on an activity Congress chose not to subsidize.” Regan, 461 U.S. at 544, 103 S.Ct. 1997. Thus, the Court equated tax-deductible donations to “public funds,” since the donor can then reduce his or her taxable income by this amount. See also id. at 544 & n. 6, 103 S.Ct. 1997 (characterizing the “congressional purpose” as “ensuring that no tax-deductible contributions are used to pay for substantial lobbying”). In this way, Regan indicates that the government’s in *428 direct grant of public funds, vis-á-vis the tax deductions, allows the government to condition the nonprofit organizations’ receipt of those tax-deductible donations on certain First Amendment restrictions.
Rust upheld certain conditions on federal- funds for family planning services which required that service providers not advocate for abortion or provide abortion counseling with funds for the program, Title X. Rust, 500 U.S. at 178-81, 196, 111 S.Ct. 1759. The Court stated: “[W]e have here not the case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded.”- Id. at 194-95, 111 S.Ct. 1759. The Court relied on its prior precedent upholding conditions that would be violative of the Constitution if not attached to a grant of public funds: “We have recognized that Congress’ power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use.” Id. at 195 n. 4, 111 S.Ct. 1759 (citations omitted).
Accordingly, the common thread in Rust and Regan is that the government may attach certain speech restrictions to funds linked to the public treasury — when either granting cash subsidies directly from the public coffers (Rust) or approving the withholding of funds that otherwise would go to the public treasury (Regan). See also Nat’l Endowment for the Arts v. Finley, 524 U.S. 569, 587-88, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (“[Ajlthough the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria that’would be impermissible were direct regulation of speech or a criminal penalty at stake.... Congress has wide latitude to set spending priorities.” (citing Regan, 461 U.S. at 549, 103 S.Ct. 1997)); Jason Mazzone, The Waiver Paradox, 97 Nw. U.L.Rev. 801, 821-22 (2003) (“The rationale underlying these cases upholding conditions attached to government benefits [including Rust and Regan ] appears to be that they all involve programs in which the government spends money to promote some social goal.”).
In these ways, the bingo program in Texas is wholly distinguishable from the subsidies in Regan[2] and Rust,[3] simply be *429 cause no public monies or “spending” by the state are involved. The Black’s Law Dictionary definition of “subsidy” is informative:
A grant, [usually] made by the government, . to any enterprise whose promotion is considered to be in the public interest. Although governments sometimes make direct payments (such as cash grants), subsidies are [usually] indirect. They may take the form of researeh-and-development support, tax breaks, provision of raw materials at below-market prices, or low-interest loans or low-interest export credits guaranteed by a government agency.
Black’s Law Dictionary 1565 (9th ed.2009). Aside from the Charities’ promotion of the public interest, the licensing scheme in the Bingo Act does not fall into even a broad interpretation of these examples of “grants ... made by the government.” There is no direct or indirect receipt of funds from the public fisc. The only “grant” here is the legislative authority to conduct what would be illegal otherwise — bingo games.
Moreover, the bingo games are not state-run; they are merely licensed and regulated by the state. The Commission argues that the program constitutes a subsidy in part because there is no functional difference between the current structure of the program and an alternative structure where the state runs the bingo games and then distributes the funds to the Charities itself. I disagree. In the latter scenario, the state would expend its own resources to conduct the games and make all business decisions, and the Charities would be mere passive beneficiaries of the state’s grace, Cf. Regan, 461 U.S. at 549, 103 S.Ct. 1997 (“[A]ppropriations are comparable to tax exemptions and deductions, which are also ‘a matter of grace [that] Congress can, of course, disallow ... as it chooses.’ ” (citation omitted)). Here, however, the Commission’s own website describes bingo as a “business.” As the Charities argue, “[t]he .revenue charities realize from bingo is what they earn from the exercise of their lawful business. It ‘does not come .from the government, and it does not cost the taxpayers a dime.’ ” Instead, the Charities pay the state an annual licensing fee, as well as five percent of each bingo prize awarded.[4] Tex. Occ. Code §§ 2001.104, 2001.502.
*430 The premise upon which Regan and Rust are based — that the state has broad authority under its spending powers to attach conditions to its grant of public funds — is thus inapposite to the facts of this case. Rather, the Bingo Act’s regulatory scheme is more akin to most other occupational licenses, where the state grants an entity that satisfies certain qualifying criteria the authority to do what would be illegal in the absence of the license — here, conduct bingo games. See Black’s Law Dictionary 1002 (defining “license,” in relevant part, as “[a] permission, [usually] revocable, to commit some act that would otherwise be unlawful”). The Charities point to several features of the bingo program that convincingly illustrate its primary function, as a regulatory scheme:
The Commission’s Charitable Bingo Division is recognized by the Texas Attorney General as a “law-enforcement agency[.]”[5] It employs licensed peace officers, auditors, etc. and enjoys broad authority over all aspects of the bingo game.[6] It licenses the charities that conduct bingo as well as other related, noncharitable, occupations (bingo equipment manufacturers, lessors of bingo premises, etc.). It regulates the types of games that may be played, their frequency and times, and the qualifications of bingo employees. It distributes no government funds or any other largesse, other than the right to engage in a highly regulated trade. This is a regulatory function, utterly undifferent [sic] from other licensing agencies such as the Texas Alcoholic Beverage Commission, Texas Department of Licensing and Regulation, and the Texas Racing Commission.
These features only underscore the incongruity of the “subsidy” paradigm to the bingo program here.
As one court aptly stated, “simply because, both subsidies and licenses enure a benefit does not mean they are one and the same.... [The government] may not use its regulatory powers to influence or penalize speech.” Satellite Broad. & Commc’ns Ass’n of Am. v. F.C.C., 146 F.Supp.2d 803, 830 (E.D.Va.2001), aff'd, 275 F.3d 337 (4th Cir.2001) (citations omitted). Accordingly, I would hold that the Bingo Act creates a regulatory regime that grants the Charities a benefit — in the form of a license — to conduct bingo games, rather than a government subsidy. The Bingo Act’s political speech restrictions would thus be subject to the Supreme Court’s jurisprudence relating to the “unconstitutional conditions doctrine” and political speech restrictions. Once the analysis is removed from the “subsidy” realm, then, the unconstitutionality of the Bingo Act’s political advocacy restrictions becomes apparent.[7]
*431 III.
A.
The “unconstitutional conditions doctrine” is long-standing:
For at least a quarter-century, this Court has made clear that even though a person has no ‘right’ to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech.
Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 59, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (citation omitted) (re-affirming the unconstitutional conditions doctrine).
A state’s mere licensing of an entity does not empower the state to attach constitutional restrictions to the granting of that license. For example, in 44 Liquormart, Inc. v. Rhode Island, the Supreme Court held unconstitutional under the First Amendment a state’s statutory prohibition against advertisements that provided the public with accurate information relating to liquor prices. 517 U.S. 484, 489, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (plurality op.). In so ruling, the Court reasoned:
That the State has chosen to license its liquor retailers does not change the analysis. Even though government is under no obligation to provide a person, or the public, a particular benefit, it does not follow that conferral of the benefit may be conditioned on the surrender of a constitutional right. In Perry v. Sindermann, ... the Court explained that government “may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-espeeially his interest in freedom of speech.” That teaching clearly applies to state attempts to regulate commercial speech, as our cases striking down bans on truthful, nonmisleading speech by licensed professionals attest.
Id. at 513, 116 S.Ct. 1495 (citing, inter alia, Bates v. State Bar of Ariz., 433 U.S. 350, 355, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (licensed attorneys); Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (licensed pharmacists)) (other citations omitted); see also R.S.W.W., Inc. v. City of Keego Harbor, 397 F.3d 427, 434 (6th Cir.2005) (“Under the unconstitutional conditions doctrine, ‘a state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license or an entertainment permit, on an agreement to refrain from exercising one’s constitutional rights[.]’ •” (citation omitted)).[8]
*432 In accordance with the Supreme Court’s unconstitutional conditions jurisprudence, I conclude that the Bingo Act’s political advocacy restrictions are facially invalid because they fail to survive strict scrutiny. See, e.g., Alliance for Open Soc’y Int’l, Inc. v. U.S. Agency for Int’l Dev., 651 F.3d 218, 234-39 (2d Cir.2011), aff'd, — U.S.-, 133 S.Ct. 2321, 186 L.Ed.2d 398 (2013) (concluding that certain restrictions on funding recipients’ speech were unconstitutional conditions by analyzing the restrictions under heightened scrutiny).
B.
“The freedom of speech ... which [is] secured by the First Amendment against abridgment by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State.” Burson v. Freeman, 504 U.S. 191, 196, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (alterations in original) (quoting Thornhill v. State of Alabama, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)). “Laws that burden political speech are ‘subject to strict scrutiny,’ which requires the Government to prove that the restriction ‘furthers a compelling interest and is narrowly tailored to achieve that interest.’ ” Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 340, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (citation omitted).
The Bingo Act prohibits the Charities from using their bingo proceeds, inter alia, to “support or oppose a measure submitted to a vote of the people” or “influence or attempt to influence legislation.” [9] See Tex. Occ.Code §§ 2001.456(2), (3). Accordingly, these prohibitions constitute facial restrictions on the Charities’ political advocacy, albeit within the confínes of the bingo program, and are therefore subject to strict scrutiny.
C.
The Commission asserts three rationales for the Bingo Act’s political advocacy restrictions: 1) regulating gambling, including “limiting the size of the state’s gambling industry”; 2) combating fraud on Texas’s citizens, meaning “ensuring that [citizens’] money goes only toward the charity advertised by the bingo hall” and “not lobbyists”; and 3) protecting charities from squandering bingo revenue on political advocacy, as opposed to their “charitable purpose.” The Commission characterizes these interests as “substantial,” rather than “compelling,” since, as the Charities and the district .court point out, the Commission never even attempts to justify the political advocacy restrictions under strict scrutiny. Rather, the Commission feebly contends that the Bingo Act does not target political speech, even .though the Act facially does just that.
As to the first asserted interest, the Commission is correct that the state has a “substantial interest” in regulating gambling, including limiting the size of the industry. See Greater New Orleans *433 Broad. Ass’n v. United States, 527 U.S. 173, 185-86, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (recognizing that the government may have a “substantial interest” in restricting gambling to combat its related social ills, including corruption, organized crime, bribery, drug trafficking, and gambling addiction). Aside from thé fact that the Commission cites to no case identifying this interest as “compelling,” as opposed to “substantial,”[10] however, the Commission fails to explain how its interest in regulating gambling translates into a compelling interest in regulating political speech that may or may not relate to gambling. As the Supreme Court stated in 44 Liquor-mart:
The text of the First Amendment makes clear that the Constitution presumes that attempts to regulate speech are more dangerous than attempts to regulate conduct.... [T]he First Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another means that the government may use to achieve its ends.
517 U.S. at 512, 116 S.Ct. 1495; see also Greater New Orleans Broad., 527 U.S. at 193, 119 S.Ct. 1923. The Commission fails to connect the conduct it has broad power to regulate with the political advocacy restrictions in the Bingo Act. This same logic applies to the Commission’s asserted interests in combating fraud and ensuring that bingo proceeds go towards the Charities’ charitable purposes.
The Commission also fails to explain why the Charities’ political speech should be curtailed in order to limit the size of the gambling industry, while other gambling operators, i.e., dog and horse racetrack operators, may engage in unfettered political advocacy. The Texas Racing Act (“Racing Act”) authorizes racetrack operators to conduct gambling within the state. Tex.Rev.Civ. Stat. art. 179e, § 1.02 (2012). However, these operators are not subject to any political speech restrictions. See id. This differential treatment among speakers that engage in substantially similar conduct — facilitating gambling in the state — undermines the legitimacy of the state’s asserted interest in limiting the gambling industry’s size. See Citizens United, 558 U.S. at 341, 130 S.Ct. 876 (“We find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers.”).
In Citizens United, the Supreme Court held that the government may not, under the First Amendment, suppress political speech on the basis of the speaker’s corporate identity. Citizens United, 558 U.S. at 365, 130 S.Ct. 876. Citizens United involved a facial First Amendment challenge to 2 U.S.C. § 441b, which, inter alia, made it unlawful for “any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with” certain elections. See 2 U.S.C. §'441b(a). The Supreme Court struck down thé relevant provisions because they constituted a ban on corporate speech, notwithstanding the fact that corporations could form political action committees that would be able to engage in advocacy: “[T]he Government-may not suppress political speech on the basis of the speaker’s *434 corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations.” See Citizens United, 558 U.S. at 365, 130 S.Ct. 876. The relevant restrictions in Citizens United also exempted media corporations; those companies were not subject to § 441b’s ban on corporate expenditures. Id. at 351, 130 S.Ct. 876. The Court found no compelling reason for differentiating between media corporations and other corporations, in light of the admittedly dubious governmental interest in preventing “the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public’s support for the corporation’s political ideas,” i.e., the “antidistortion rationale.” See id. at 348, 130 S.Ct. 876 (citation omitted). The Court reasoned:
There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not....
[B]y its own terms, the law exempts some corporations but covers others, even though both have the need or the motive to communicate their views.... This differential treatment cannot be squared with the First Amendment.
Id. at 352,130 S.Ct. 876 (citations omitted). Accordingly, the Court concluded: “The law’s exception for media corporations is, on its own terms, all but an admission of the invalidity of the antidistortion rationale.” Id.
Similarly here, Texas law’s exemption of dog and horse racetrack operators from any political speech restrictions undermines the Commission’s asserted interest in curtailing the size of the gambling industry.[11] See also The Fla. Star v. B.J.F., 491 U.S. 524, 540, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (holding that a statute’s underinclusiveness “raises serious doubts” about whether the law in fact *435 serves the government’s asserted interest).[12]
More importantly, even if the Commission’s interests are compelling, the political advocacy restrictions are not narrowly tailored to achieve those ends. A law is narrowly tailored if it “advances the state’s interest ..., does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).” Republican Party of Minn. v. White, 416 F.3d 738, 752 (8th Cir.2005) (en banc) (citations omitted).
The availability of nonspeech alternatives for regulating the gambling industry, combating fraud, and ensuring that the Charities use their bingo proceeds for charitable purposes render the Bingo Act’s political advocacy restrictions facially invalid because the speech restrictions are not the least restrictive means to achieve these ends. See, e.g., Greater New Orleans Broad., 527 U.S. at 192, 119 S.Ct. 1923 (suggesting nonspeech alternatives for curtailing gambling, including “a prohibition or supervision of gambling on credit; limitations on the use of cash machines on casino premises; controls on admissions; pot or betting limits; location restrictions; and licensing requirements”); Vill. of Schaumburg v. Citizens for a Better Env’t, 444 U.S. 620, 637-38, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (discussing how an unconstitutional statute prohibiting charitable fundraising could have been more narrowly tailored by reasoning that “[ejfforts to promote disclosure of the finances of charitable organizations also may assist in preventing fraud by informing the public of the ways in which their contributions will be employed”); see also Riley v. Nat'l Federation of the Blind of N.C., Inc., 487 U.S. 781, 790-92, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (citations omitted) (holding that a statute regulating charities’ solicitation by professional fund raisers was not narrowly tailored to promoting the state’s interest in protecting the public and charities from fraud, and to ensuring maximum financial support for the charities for their own benefit). Regarding the Commission’s third asserted interest, the Bingo Act already requires that the Charities use the bingo proceeds for their charitable purposes, and, as the majority concludes, “an organization’s use of bingo proceeds for political advocacy is [not] inconsistent with the charitable purpose requirement absent the restrictions in [Tex. Occ.Code] § 2001.456,” see ante, at 420, restrictions which I conclude are unconstitutional and severable.
Moreover, even though the Bingo Act does not constitute a complete ban on the Charities’ political advocacy, the Commission has not identified a compelling enough interest in burdening the Charities’ First Amendment rights in the first instance. While restricting the Charities’ - political advocacy using the bingo proceeds may be more narrowly tailored than an outright ban on all political speech, there are less restrictive ,(i.e., nonspeech) means of achieving the state’s asserted interests here. Accordingly, because the Bingo Act’s political advocacy restrictions fail to satisfy strict scrutiny, I conclude that they are facially invalid under the First Amendment.
*436 IV.
I therefore would affirm the district court’s judgment concluding that the political advocacy restrictions are unconstitu-. tional and permanently enjoining their enforcement.

. While these provisions have been amended since Regan was decided in 1983, the substance of the provisions remains unchanged.

. Regan was also predicated upon the government's broad authority in establishing tax policy, another feature which sets that case apart from the instant case. See Regan, 461 U.S. at 547, 103 S.Ct. 1997 ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes.”); see also Lloyd Hitoshi Mayer, Charities and Lobbying: Institutional Rights in the Wake of Citizens United, 10 Election L.J. 407, 416. (2011) ("[The Supreme Court] has consistently showed significant deference to Congress when it comes to tax law even when addressing constitutional challenges.” (citations omitted)).

. Rust is further distinguishable because that case involved governmental speech, where the state has a particularly strong interest in safeguarding a governmental program's message: The Court in Rust did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech; when interpreting the holding in later cases, however, we have explained Rust on this understanding. We ■ have said that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like Rust, in which the government "used private speakers to transmit specific information pertaining to its own program.” As we said in [Roseriberger v. Rector & Visitors of University of Virginia, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)], "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is *429 neither garbled nor distorted by the grantee.”
Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (alteration in original) (other citations omitted).

. A useful distinction can be drawn between this structure and that of state-run lotteries, for which states are increasingly entering into contracts with -private management companies for their long-term operation. See Office of Legal Counsel, U.S. Dep’t of Justice, Scope of Exemption under Federal Lottery Statutes for Lotteries Conducted By a State Acting under the Authority of State Law, 2008 WL 4671395, at *1 (Oct. 16, 2008). Federal law generally prohibits 1he advertisement and promotion of lotteries in interstate commerce. Id. (citing 18 U.S.C. §§ 1301-04, 1953(a)). However, federal law exempts from these pro-hibitions, inter alia, lotteries "conducted by [a] State acting under the authority of State law.” Id. (citations omitted). In providing guidance regarding whether or not a lottery is "conducted by [a] State,” the Office of Legal Counsel issued an advisory opinion describing some features of a state-run lottery:
We conclude that the statutory exemption for lotteries "conducted by a State” requires that the State exercise actual control over all significant business decisions made by the lottery enterprise and retain all but a de minimis share of the equity interest in the profits and losses of the business, as well as the rights to the trademarks and other unique intellectual property or essential assets of the State's lottery....
[M]erely regulating the lottery, or licensing a private lottery concession pursuant to detailed standards prescribed by the State, plainly cannot be sufficient to satisfy the *430 requirements of the statutory exemption [for lotteries conducted by a state].
Id. at *1, *3. The bingo program in Texas, by contrast, has none of the features that would indicate that it is state-run.

. See Tex. Att’y Gen., Informal Letter Ruling No. OR2012-14155, 2012 WL 4041287, at *2 (Sept. 6, 2012) ("This office has determined the [Commission is a law enforcement agency.” (citations omitted)).

. See Tex. Occ.Code § 2001.053 ("The [Commission may employ officers or investigators[.]”); id. § 2001.051(b) ("The [Commission has broad authority and shall exercise strict control and close supervision over all bingo conducted in this state[.]"); see also Tex. Gov't Code § 467.101(a)(1) ("The [Commission has broad authority and shall exercise strict control and close supervision” over several activities, including bingo.).

.It is true that the state of Texas has made a policy- decision to allow only the Charities to conduct bingo games in order to provide additional income to these organizations whose missions are in the public interest. However, *431 I would hold that the state’s grant of this benefit is insufficient to bring it within the Supreme Court’s jurisprudence relating to conditions on government subsidies. Further, categorizing a benefit as a subsidy does not necessarily end the analysis, as the funding conditions may still be infirm under the unconstitutional conditions doctrine. See, e.g., Alliance for Open Soc’y, 133 S.Ct. at 2328-30 (applying the unconstitutional conditions doctrine to a speech restriction on the receipt of government funds and concluding the restriction was unconstitutional, under the First Amendment).

. Notably, the foregoing cases striking down First Amendment restrictions on a state's grant of a license took place in the commercial speech context. "The Constitution ... affords a lesser protection to commercial speech than to other constitutionally guaranteed expression.” United. States v. Edge Broad. Co., 509 U.S. 418, 426, 113 S.Ct. 2696, *432 125 L.Ed.2d 345 (1993) (citations omitted). The argument is therefore even more compelling that the restrictions on political speech here are suspect under the unconstitutional conditions doctrine. See R.A.V. v. St. Paul, Minn., 505 U.S. 377, 422, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (Stevens, J., concurring in judgment) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position; commercial speech ... [is] regarded as a sort of second-class expression.").

. The Charities do not challenge the Bingo Act’s prohibition on the use of bingo proceeds “to support or oppose a candidate or slate of candidates for public office.” See Tex. Occ. , Code § 2001.456(1).

. Under the less rigorous, intermediate scrutiny, a regulation will be upheld under the First Amendment if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests.” Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (internal quotation marks and citation omitted).

. The Commission contends that, while "horse-track racing is gambling,” "it has not been the subject of a longstanding constitutional ban, like games, of pure chance.” Rather, the Commission contends, "[s]ince early statehood, the Texas Constitution has banned lotteries, bingo, gift enterprises, and other 'schemes for the distribution of prize by chance.’ ” (citing State v. Randle, 41 Tex. 292 (1874)). As a result, the Commission observes that no constitutional amendment was necessary before passage of the Racing Act, unlike the Bingo Act. Further, the Commission points out that "horse-track races may be conducted by any entity or individual, whether non-profit or for-profit, who applies for a license ... including the [CJharities in this case.”
Nevertheless, the Commission has provided no compelling reason for this court to differentiate between operators of bingo games and operators of dog and horse racetracks, especially in light of Citizens United. The Commission’s historic account of the development of gambling fails to explain how this history translates into a compelling reason for the disproportionate burden on the Charities' First Amendment' rights specifically. Again, the Commission’s argument perhaps explains why there wo.uld be differences in the regulatory schemes of the two forms of gambling, but this distinction does not explain why the Charities’ political speech rights should be disproportionately burdened as a result. Moreover, the Texas legislature authorized the two forms of gambling in the state within five years of one another: It passed the Bingo Act first, in 1981, following the voters’ approval of a constitutional amendment, and it passed the Racing Act in 1986. See Bingo Act, 67th Leg., 1st C.S., ch. 11, 1981 Tex. Gen. Laws 85 (current version at Tex. Occ. Code § 2001.001 et seq.); Racing Act, 69th Leg., 2d C.S., ch. 19, § 1, 1986 Tex. Gen. Laws 48, 53 (current version at Tex.Rev.Civ. Stat. art. 179e). The fact that the there was no formal, historic ban on racetrack betting thus seems of limited relevance for our purposes.

. Texas’s differential treatment of the speech rights of gambling operators is likewise suspect, in and of itself, under Citizens United. However, I would not necessarily conclude that this difference alone is sufficient to rule the political advocacy restrictions facially invalid; rather, it informs the analysis of whether the state has proffered a compelling justification for the speech restrictions.